# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

### HELENA DIVISION

====================================================

Case No. CR-07-24-H-CCL


UNITED STATES OF AMERICA,

                    Plaintiff,

versus

DANIEL DIETZ,

                    Defendant.


**************************************************

## TRANSCRIPT OF PROCEEDINGS

**Sentencing**
Courtroom
United States District Court
Paul G. Hatfield Courthouse
Helena, MT  59601
September 23, 2008

## The Honorable Charles C. Lovell, Presiding

**************************************************


**Julie L. Sampson**
**Court Reporter**
**For The Record Reporting Services**
**PO Box 176**
**Butte, Montana  59703**
**(406) 498-3941**

1   **APPEARANCE OF COUNSEL:**

2

3
    **For the Plaintiff:**
4
    Ms. Paulette Stewart
5   Assistant U.S. Attorney
    U.S. Attorney's Office
6   901 Front Street
    Helena, MT 59626
7   (406) 457-9352

8
    **For the Defendant:**
9
    Mr. Michael Donahoe
10  Senior Litigator
    Federal Defenders of Montana
11  Great Northern Town Center
    50 West 14th Street, Suite 300
12  PO Box 250
    Helena, Montana  59610-0250
13  (406) 449-8381

14
    **Also Present:**
15
    Margaret Bentwood, Law Clerk
16  Darlene DeMato, Courtroom Clerk
    Julie L. Sampson, Court Reporter
17

18

19

20

21

22

23

24

25

1

<u>**INDEX:**</u>

2

3

<u>**WITNESS:**</u>                                        <u>**PAGE**</u>:

4

<u>**LINDA FRANTZ**</u>

5

Direct Examination by Mr. Donahoe . . . . . . 10
Cross-Examination by Ms. Stewart. . . . . . 20

6

<u>**THERESA LUCUS**</u>

7

Direct Examination by Mr. Donahoe . . . . . . 22
Cross-Examination by Ms. Stewart. . . . . . 26

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

\*\*\*\*\*\*

1                    <u>**PROCEEDINGS**</u>

2

3                **(The proceedings began at 10:53 a.m.)**

4

5                    THE BAILIFF:  All rise.

6                    THE COURT:  Be seated, please.  The next

7       matter this morning is criminal cause 07-24, a

8       Helena Division case, United States of America

9       against Daniel Dietz.  The Defendant is present

10      with his counsel, Mr. Donahoe.  The United States

11      is here by Ms. Stewart.  We are ready to proceed.

12                    This is the time set down for sentencing.

13      Mr. Dietz and Mr. Donahoe, will you come to the

14      podium, please.

15                    Mr. Dietz, you've read over the

16      Presentence Report, have you?

17                    THE DEFENDANT:  Yes, Your Honor.

18                    THE COURT:  And have you had an ample

19      opportunity to study it and to ask Counsel about

20      its content, also to ask him about your rights in

21      connection with the report and with sentencing?

22                    THE DEFENDANT:  Yes, I have, Your

23      Honor.

24                    THE COURT:  Very well.  Michael, you've

25      had ample time?

1          MR. DONAHOE:  Yes, Your Honor.

2          THE COURT:  Ms. Stewart?

3          MS. STEWART:  I have, Your Honor.  Thank

4     you.

5          THE COURT:  Very well.  The Presentence

6     Report, then, will be placed in the record under

7     seal.  And Mr. Dietz, it was in April, I think

8     April 11 this year, when you pleaded guilty to

9     Counts I and II of a two-count indictment.  You

10    also pled true to the forfeiture allegation

11    relating to the computer used in the offense.

12    Count I charged you with coercion and entitlement

13    of a minor in violation of federal law, and Count

14    II charged transfer of obscene material to a minor

15    in violation of federal law.

16         Now, there were two objections to the

17    Presentence Report.  I wonder what the present

18    status of those is.  With respect to restitution,

19    is this figure agreed upon between the parties?

20    And the number I have here is $3,524.01.

21         MR. DONAHOE:  Your Honor, we came, in the

22    sentencing memorandum, to a concluding number of

23    $889.30.

24         THE COURT:  Was that the total amount?

25         MR. DONAHOE:  No, Your Honor.  The first

1        total amount was $4,376.30, and then I think

2        probation reduced that to the number that Your

3        Honor just recited.

4                THE COURT:  All right.  Let us reduce

5        this to a legal issue, if possible, so that the

6        Court can resolve it.  Otherwise, we'll have to

7        take testimony on the facts involved, so that the

8        Court can determine the reasonable amount involved.

9        The -- I understand there were some attorney's fees

10       set out here which you objected to, and they have

11       been removed.

12                It seems to the Court here that

13       restitution in the case is appropriate and

14       applicable, not only for the minor person, the

15       person who was directly harmed, but also because

16       she was under the age of 18.  Her legal guardian --

17       and here the legal guardian, of course, may assume

18       victim's rights under this section.  Lost income,

19       about which we were concerned, in part, is

20       specifically approved by the statute as an item of

21       restitution.

22                The Pizzichiello case in the Ninth

23       Circuit has been considered, where the panel

24       approved the sum of $21,000 in lost wages and

25       $7,500 in travel expenses awarded to family members

1    of the deceased victim.  Expenses incurred during

2    investigation and prosecution are recoverable and

3    available for restitution.

4          So, now, as I understand the probation

5    officer's investigation, he compared the income of

6    the guardian, which she regularly received from her

7    position, during months not involved with handling

8    the infant's case to the monthly income when she

9    was required to devote time away from her job and

10   take care of the minor.

11         In this particular case, that amount,

12   that differential due to her being unable to work

13   during those hours and days and times, is what it

14   adds up, in addition to what you agreed to, to the

15   total figure of 3,500.  Now, if we can agree upon

16   those facts, then I think the question is resolved,

17   because the Court holds that those are recoverable

18   costs and that they should be part of the

19   restitution.

20         So, unless you have anything to show that

21   she didn't do these things that she claims that she

22   did, I think that figure seems to be a fair figure.

23   What do you say to that, Mr. Donahoe?

24         MR. DONAHOE:  We'll stipulate to that,

25   Your Honor.

******

1              THE COURT:  Very well.  That figure is

2      $3,524.01.  And the Court, as part of the sentence

3      here today, ultimately will award that.

4              Now, the other objection related to the

5      five-point enhancement, but I believe that

6      objection is withdrawn.

7              MR. DONAHOE:  It is.

8              THE COURT:  Is that correct?

9              MR. DONAHOE:  It is, Your Honor.

10             THE COURT:  Is there anything further you

11     want to say about it?

12             MR. DONAHOE:  No, Your Honor, beyond the

13     papers.

14             THE COURT:  Then with the disposition of

15     those two objections, the Court is prepared to make

16     findings with respect to the case.  First of all,

17     the total offense level is found to be 34.  The

18     criminal history category is found to be 4.  There

19     is a manditory minimum sentence of ten years as to

20     Count I, there is a statutory maximum sentence of

21     life as to that count, and ten years as to Count

22     II.  The Court finds the Guideline range to be 210

23     to 262 months, the fine range to be $17,500 to

24     $175,000.

25             Any objection to those determinations,

1    Ms. Stewart?

2              MS. STEWART:  No, Your Honor.

3              THE COURT:  Mr. Donahoe?

4              MR. DONAHOE:  No, Your Honor.

5              THE COURT:  Very well.  We are ready to

6    proceed, then.

7              Mr. Dietz, before the Court formulates

8    and imposes your sentence, you have a right of

9    allocution.  You can exercise that right by

10   testifying, by making a statement to the Court, by

11   calling witnesses, by having your counsel speak for

12   you, any or all those things as you see fit in your

13   own best interest.  So, this is your time, and you

14   may proceed.

15             MR. DONAHOE:  Your Honor, we would please

16   call Linda Frantz.

17             THE COURT:  Very well.  Come forward and

18   be sworn, please.

19             COURTROOM CLERK:  Right here, please.

20   Please raise your right hand.

21

22                    **LINDA FRANTZ,**

23        **having been first duly sworn, testified under**

24   **oath as follows:**

25             THE WITNESS:  I do.

**\*\*\*\*\*\***

1          COURTROOM CLERK:  Please state your full

2     name and spell your last name.

3          THE WITNESS:  Linda Frantz, F-R-A-N-T-Z.

4          COURTROOM CLERK:  Thank you.  Please have

5     a seat in the witness stand and speak clearly into

6     that microphone.

7          MR. DONAHOE:  Judge, do you want Dan to

8     sit down?

9          THE COURT:  I think that would be fine.

10

11              **DIRECT EXAMINATION**

12   BY MR. DONAHOE:

13     Q.   **Ma'am, are you related to Dan Dietz?**

14     A.   Yes.

15     Q.   **How so?**

16     A.   I'm his mother.

17     Q.   **Where was Daniel raised?**

18     A.   In Pennsylvania, Bethel.

19     Q.   **Can you tell us what the composition of your**

20   **family was in the early years.**

21     A.   Uhm, how early?  You mean --

22     Q.   **I want you to start from the beginning, if you**

23   **could just give me a quick history on when Dan was born,**

24   **how many brothers and sisters he has and so forth.**

25     A.   Okay.  He was born in 1970 and he had an older

****** 

*For The Record Reporting Services*
*Julie Sampson - (406) 498-3941*

1  sister.  His father and I divorced.

2       Q.   **What was Mr. Dietz's name?**

3       A.   Walter.

4       Q.   **How old was Dan when you divorced from**

5  **Walter?**

6       A.   I believe he was three -- three or four.

7       Q.   **Did Dan remain in contact with Walter?**

8       A.   They did.  It wasn't -- it wasn't every

9  weekend, but he tried to -- his father tried to see him

10  as much as he could.  And then I remarried and we had

11  another daughter.

12       Q.   **And that would be Melissa?**

13       A.   Actually, no, that's Michelle.

14       Q.   **I'm sorry.  Michelle?**

15       A.   She is not here.  And during that time, his

16  dad used to come and take them and they would go away

17  and do things together, and one weekend they went on a

18  boating trip.  And during that trip, his father drowned.

19  They went over a falls.  And Danny was with him, saw him

20  go under the water.  Danny was pulled from the water,

21  and it took a week for them to find his father's body.

22  At that time he was nine, I believe.

23       Q.   **So Dan was nine years old when that**

24  **happened?**

25       A.   Yeah.

******

1      Q.   Okay.  Now, as a result of the divorce from

2 Walter, was Dan having his struggles just in connection

3 with that?

4      A.   He probably did, but I didn't notice a lot of

5 things.  I think when I remarried there were some

6 problems there with his stepfather.  His stepfather was

7 a few years younger than me and took on a family of two

8 children and a wife, and then we had a third child.  So

9 his -- it was just a lot for him, which caused

10 problems.

11      Q.   After Walter became deceased or died in the

12 boating accident, did you notice any difference -- or

13 begin to notice any difference in Dan?

14      A.   I did then.

15      Q.   Can you describe that for us.

16      A.   During the week that they searched for his

17 dad's body he was having problems in school.  They both

18 went back to school, and I think we all just wanted to

19 believe that they were going to find him and he was

20 going to be okay.  So they went back to school to try to

21 at least have a normal life.  I did get a call from the

22 school that he was acting out, and I told them maybe I

23 need to get him some help, take him out of school and

24 get him some help, and they said no, we know what has

25 happened and we'll work with him.

**\*\*\*\*\*\***

1    Q.   Uh-huh.

2    A.   And I put my faith in them.  I was young.  And

3  things just progressed and got worse.  Dan never talked

4  to me about it.  I asked him, I said, "Danny, you got to

5  talk to me, you have to tell me how you're feeling," and

6  he looked at me, he said, "I'm going to tell you this

7  one time."  He said, "We went over the falls and the

8  last thing I saw was daddy's face."  And he screwed up

9  his face and made the face that his father had made when

10  he went under the water, and that's the last thing he

11  remembers seeing of his dad.  And he said, "I'll never

12  talk to you about it again."

13    Q.   **And he didn't, did he?**

14    A.   He didn't.

15    Q.   **It wasn't really discussed in the family or**

16  **worked through in any sort of grieving process, was**

17  **it?**

18    A.   No, it wasn't.  His stepfather had a problem

19  with it.  I can't explain it.  I don't even want to try.

20  There was an incident where Danny had said to his

21  stepfather -- he called him dad, and his stepfather

22  said, "I'm not your dad.  Don't ever call me dad."  And

23  he just recently told me -- he just recently told me

24  within the last two months that that was the day that he

25  never felt safe at home again.  Home was not a safe

******

1   place for him.

2       Q.   So if we move on from the age of ten or so and

3   through the remainder of those middle school years and

4   into high school, did things get better, remain the

5   same, or get worse?

6       A.   They got worse.  Uhm, Danny was always very

7   respectful to myself and to his stepfather, to the

8   parents of all the kids he went to school with.  What he

9   did when I couldn't see him -- and I -- I know that

10  there were problems.  He was good at keeping it from me.

11  But, yes, it did get worse.

12      Q.   Did you finally kind of lose contact with

13  Dan?

14      A.   We did.  When he graduated high school he came

15  out to Montana.  My father lived out here and they lived

16  together.  He actually came out to help take care of

17  him.  And he got in contact with other family members

18  and started to get involved with the church and his life

19  started to turn around.  And he met his wife.  They

20  married.  They started working with Indian children, had

21  two children of their own, and I thought that things

22  were finally -- finally working themselves out.  And he

23  worked through some of his issues with his father, but

24  apparently not all of them.

25      Q.   Then at some time after he married Theresa

******

1  they became divorced, didn't they?

2      A.   They did.  His financial situation got worse

3  and he came back to Pennsylvania to maybe find a better

4  job and get those things straightened out.  But when he

5  came back there, that's when they divorced, after a few

6  months, and things really got bad.

7      Q.   Now, despite the divorce, have you stayed in

8  contact with Theresa and your granddaughters?

9      A.   Yes, we have.

10     Q.   So you've tried to keep intact some semblance

11 of family, huh?

12     A.   Yeah, we do.

13     Q.   As a result of these events have you actually

14 been reacquainted or reunited with Theresa?

15     A.   Yes, we have.  We were here a few weeks ago.

16 We were out a couple times.  Every time we come out we

17 go see Theresa.  We visit the girls.  This time we were

18 going to stay with them.  We didn't, then, only because

19 of, you know -- but, yeah, we get along fine.  And

20 Theresa is a good mother and she -- she is part of the

21 family.

22     Q.   Now, have you and Theresa discussed, or at

23 least in principle agreed, that no matter where Dan

24 might wind up, hopefully maybe someplace close to you,

25 that you would help facilitate visits between him and

1  his children?

2      A.   Yes, we absolutely would try to do the best

3  that we can to make sure that they stay in contact with

4  each other.

5      Q.   **You are going to be there for Dan and for your**

6  **granddaughters, correct?**

7      A.   Absolutely.

8      Q.   **Do what you can to see what you can do to help**

9  **Dan recover and become a productive member of society?**

10     A.   Absolutely.

11     Q.   **Now, did these events and circumstances**

12  **connected with this case really present an opportunity**

13  **for people in the family to start discussing some of**

14  **Dan's issues and problems?**

15     A.   We have.  And Dan and his stepfather have

16  actually mended a lot of the differences between them.

17  My husband's come to see that in the early years of our

18  marriage a lot of those things helped to shape Dan for

19  who he is today, but he also had a lot of good qualities

20  that Danny's come to see and they have become very

21  close.

22     Q.   **Likewise, with regard to Dan and his sister**

23  **Tina, did you learn something that may have gone unsaid**

24  **between brother and sister in relation to dad's death?**

25     A.   I did.

******

1    Q.   What was that?

2    A.   I found out that the day of the accident was

3    their father's birthday and Tina wanted them to stay

4    home and spend that day -- I need water.  Tina wanted

5    her father and her brother to stay at home and spend the

6    birthday at home.  Danny wanted to go boating.  His

7    father loved boating, and he gave in and he said, "Let's

8    go boating."  And Tina was very angry about that.  When

9    the accident happened and their father drowned, she

10   blamed Danny because if he wouldn't have begged, they

11   wouldn't have gone boating.

12   Q.   Did you come to find that Dan had actually

13   carried that as guilt throughout most of his life?

14   A.   He did.  That was part of his -- yes, he did.

15   He blamed himself and I think he's been running from

16   that pain all these years.

17   Q.   Can you see in some way that Dan's lost-soul

18   personality is a derivative of all of these things in

19   his early life?

20   A.   Derivated?

21   Q.   Comes as a result of?

22   A.   Yes.  I do.

23   Q.   Do you see -- are brother and sister talking

24   now?  I mean, have they communicated on some of these

25   points, started to address these points?

1    A.   Yes, they have.  And I think they have crossed

2   a huge hurdle.  This is a very tragic situation for

3   everybody, but out of this I've seen Danny and Tina come

4   together and mend some of those -- a lot of the hurts

5   and the pains.  It's a terrible way to have to come to

6   that point, but it's happened.

7        Q.   But nevertheless, it has happened, hasn't

8   it?

9        A.   Right.

10       Q.   And, in fact, Tina traveled with you here to

11  be here today to support her brother, didn't she?

12       A.   She did.

13       Q.   She's in the gallery, isn't she?

14       A.   Yes.  She is here.

15       Q.   And other family is here, as well?

16       A.   Right.  His youngest sister is here, and I

17  have a cousin and his wife are here.  And there's others

18  that would have wanted to be here, but because of the

19  distance, it's been pretty difficult.  And they will

20  most definitely be there for him when he comes home.

21       Q.   So, have you felt some strength as a family

22  coming behind Dan to stand with him?

23       A.   We've actually pulled very close.  I've seen

24  in the last -- especially the last few months when Dan

25  started opening up and we've become very close.

******

1    Q.   All right, Ms. Frantz.  I thank you for the

2    testimony.  Is there anything else or in conclusion that

3    you would like the Court to know before the Court

4    imposes sentence?

5         A.   I would like the Court to know that we as a

6    family understand the severity of what's happened.  We

7    understand that he needs to pay a price for that.  I

8    understand that that price is going to be very steep.

9    But at the same time, I want him to get the counseling,

10   the help to continue to make him a better person.  Dan

11   is a wonderful young man, and he's gotten lost.  But

12   he's on his way back.  And whatever the sentence that's

13   imposed, Dan will turn it to good.

14        And I also would like to say to the young

15   lady's family that I don't want her to get lost in the

16   system because we are so intent on prosecuting Dan, and

17   whatever help she needs, I think we need to see that she

18   gets it, too.  It's a terrible, terrible tragedy and I

19   don't know what else to say.  I just want you to

20   understand that we know that.

21        Q.   Do you think Dan knows that?

22        A.   Absolutely.  I -- this will weigh on him for

23   the rest of his life, and he's going to live with it

24   every day of his life.  But he will turn it into

25   something good somewhere along the way, which he's

******

1    already started doing.

2                    MR. DONAHOE:  Thank you, Ms.  Frantz.  I

3        have nothing further.

4                    THE COURT:  Cross examine.

5                    MS. STEWART:  I have just a couple

6        questions.

7

8                    **CROSS-EXAMINATION**

9    **BY MS. STEWART:**

10       **Q.   So, Ms. Frantz, it's been approximately 30**

11   **years -- 30-plus years since you married your present**

12   **husband?**

13       A.   Yes.

14       **Q.   How many of those 30-plus years has the**

15   **Defendant had the problem of authority because of your**

16   **husband?  From reading the PSR, your son clearly had**

17   **problems with your husband having authority over him.**

18       A.   I don't believe that he had problems with my

19   husband having authority over him.  Uhm --

20       **Q.   Then was it just problems with authority**

21   **outside the house?**

22       A.   I don't even know that he had problems with

23   authority outside the house.  I don't know that I agree

24   with that.

25       **Q.   But he did have problems outside the house.**

                    ******

1  **He was respectful inside the house, not respectful**

2  **outside the house.**

3       A.   No, he was also respectful outside the house.

4  Even during the times that he had any kind of problems

5  that he might have had, he was still respectful, because

6  I had teachers, I had parents tell me I've never had

7  trouble with Dan; he's always been very respectful to

8  us.

9       Q.   **So, then, did you lose touch with the**

10 **Defendant when he was about 30 -- or, I'm sorry, about**

11 **20, when his criminal history began?**

12      A.   No.  No.

13      Q.   **He's always maintained contact with you?**

14      A.   Yes.  We've always been in contact.  The only

15 time that we may have lost contact is before he started

16 his AA meetings and his NA meetings and things, for a

17 few months, were really bad for him.  That's the only

18 time that we thought -- that we actually lost contact.

19      Q.   **And you alluded to this in your comments, but**

20 **you're aware that we are here because your son**

21 **victimized a 13-year-old child?**

22      A.   I know that's why we are here.

23           MS. STEWART:  Pass the witness.

24           THE COURT:  Anything further, Mr.

25 Donahoe?

******

1     MR. DONAHOE:  No, Your Honor.  Thank

2   you.

3     THE COURT:  You may step down.  Thank

4   you.

5     MR. DONAHOE:  We would next call Theresa

6   Lucus, please.

7     COURTROOM CLERK:  Right here, please.

8   Raise your right hand.

9

10                      **THERESA LUCUS,**

11      **having been first duly sworn, testified under**

12   **oath as follows:**

13     THE WITNESS:  I do.

14     COURTROOM CLERK:  Please state your full

15   name and spell your last name.

16     THE WITNESS:  Theresa Lucus, L-U-C-U-S.

17     COURTROOM CLERK:  Thank you.  Please have

18   a seat in the witness stand and speak clearly into

19   that microphone.

20

21                   **DIRECT EXAMINATION**

22   BY MR. DONAHOE:

23     Q.   **Ms. Lucus, how do you know Dan Dietz?**

24     A.   He is my ex-husband.

25     Q.   **And did you have children with Dan?**

                           ******

1       A.   Yes, I did.

2       Q.   What are their names and ages?

3       A.   Mariah Dietz, she is nine years old; Lydia

4  Dietz is seven years old.

5       Q.   And you're certainly aware of what's gone on

6  here, what Dan was charged with and what he has pled

7  guilty to?

8       A.   Yes.

9       Q.   You were aware that he was charged and

10 convicted in State court, as well?

11      A.   Yes.

12      Q.   How long were you married to Dan?

13      A.   Nine years.

14      Q.   Would you characterize that as a good

15 marriage, a good time with Dan?

16      A.   Yes.

17      Q.   A decent time?

18      A.   Yes.

19      Q.   Did you try and raise those girls to the best

20 of your ability?

21      A.   Yes.

22      Q.   Did Dan try and help you with that?

23      A.   Yes, he did.

24      Q.   Is he close to his girls?

25      A.   Yes, he is.

******

1      Q.   All right.  Now, he's been incarcerated for a

2  considerable spell here, true?

3      A.   Yes.

4      Q.   And fortunately, some of that incarceration

5  has been local.  Have you done what you could to see

6  that Dan remains in contact with his daughters?

7      A.   Yes, I have.

8      Q.   Tried to keep up and make that relationship

9  solid?

10      A.   Yes.

11      Q.   Did you hear Ms. Frantz testify about her

12  being in town, visiting with you?

13      A.   Yep.

14      Q.   Have you spoken about the future?

15      A.   Some, yeah.

16      Q.   Some.  Yeah.  And are you of a mind, barring

17  unforseen circumstances, to do what you can to see that

18  Dan will be able to maintain a relationship with his

19  kids?

20      A.   Yes.  I want them to know who he is.

21      Q.   And considering -- I'm sorry?

22      A.   I want them to know who he is.

23      Q.   Do you consider -- bearing in mind what has

24  gone on in court here and in State court, do you

25  consider that Dan poses any kind of danger to the

1    girls?

2        A.    No.

3        Q.    So you're confident that he should maintain

4    that relationship with his kids?

5        A.    Yes.

6        Q.    Is there anything in conclusion that you would

7    like the Court to know before the Court imposes

8    sentence, about Dan?

9        A.    He is -- was a good father at the time, the

10   short time that they were with him -- or he was with us,

11   and he continued to try to stay with them.  He moved out

12   here to Montana because I moved from Pennsylvania to

13   Montana.  He tried to see them as much as he could.  And

14   he -- until this day he does call -- calls them and

15   talks to them and tells them he loves them, and they

16   love him.  And I won't take that from them.

17       Q.    Sure.  When you divorced, was it hard for you,

18   Theresa?

19       A.    Yeah.

20       Q.    It was.  Dan was kind of lost around that

21   time, wasn't he?

22       A.    Uhm, I think he was just trying to find his

23   place in life.

24       Q.    Yeah.  He continues to have that struggle,

25   doesn't he?

1          A.    Yeah.

2                      MR. DONAHOE:  I have nothing further.

3      Thank you.

4                      THE COURT:  Cross-examine.

5

6                      **CROSS-EXAMINATION**

7  BY MS. STEWART:

8          Q.    Ms. Lucus, you said -- you stated you don't

9  believe the Defendant is a danger to your daughters?

10         A.    No.

11         Q.    Are you confident of that at this point?

12         A.    Yes.

13         Q.    Although he has hurt and victimized a

14  13-year-old child?

15         A.    One 13-year-old.

16         Q.    Yes.  And I noticed in your victim -- in your

17  letter you seemed to put a lot of blame on her?

18         A.    Uh-huh.

19         Q.    Although your ex-husband was a 36-year-old

20  adult male?

21         A.    Right.

22         Q.    And he knew she was 13 years old?

23         A.    Yes, he did.

24         Q.    You also know in this case that your

25  ex-husband is looking at a lengthy prison sentence?

1    A.   Yes.

2    **Q.   Do they know why he's in prison?**

3    A.   Yes, they do.

4    **Q.   And you've talked about that with them?**

5    A.   Yes, I have.

6              MS. STEWART:  Pass the witness, Your

7    Honor.

8              THE COURT:  Redirect.

9              MR. DONAHOE:  We have nothing further,

10   Your Honor.  Thank you.

11             THE COURT:  You may step down.  Thank

12   you.

13             MR. DONAHOE:  That will conclude our

14   witnesses, Your Honor.

15             THE COURT:  Very well.  Would you come

16   back up to the podium, please.  Do you have

17   anything to say on your own behalf?

18             THE DEFENDANT:  Yes, Your Honor.  I'd

19   like to say first that it's really hard to express

20   in words the regret that I feel and the remorse,

21   because I know I hurt a good friend and a young

22   lady.  And I recognize my full responsibility for

23   the crime.  I've dealt with -- since my dad died,

24   and before that, even, tried to cover up my

25   emotions using drugs and alcohol and sex, and

1       finally in November of 2006 I found a way to stop

2       the drugs and alcohol, but I didn't understand that

3       sex was a problem, as well.

4               Then I met the victim.  And I know pretty

5       deeply now how I can hurt somebody, not just using

6       drugs and alcohol, but through other ways.  And

7       I've -- being clean and being able to come to terms

8       with everything that I've done in my life, all the

9       people that I've hurt intentionally and

10      unintentionally, for this last two years, year and

11      a half, especially -- I'm finally coming to a place

12      where I can deal with my emotions and I can deal

13      with the hard things that I've gone through -- in

14      life.  And trying to -- I've been trying to make

15      amends to the people that I've hurt.

16              And since the day that I was addressed

17      about this incident with the victim I haven't

18      shirked responsibility, but I've accepted full

19      responsibility, never denied my responsibility in

20      the matter.  And thanks to Dr. Scolatti, who is the

21      psychologist that saw me in respect to the case,

22      I've come to learn a lot about, uhm -- a lot about

23      myself mentally and emotionally.

24              And I know that beyond my 12-step

25      recovery program -- that I've not stopped doing

1    since November of 2006, not one day, because I know

2    that I'll die if I don't stop -- if I stop doing

3    the program, but beyond that, I've come to learn

4    that I need more treatment and more therapy for

5    other issues that I've got.  And I hope that -- I

6    know that I'm facing a long sentence, and I just

7    hope that during that time I'll have an ability to

8    find or the opportunity to find treatment programs

9    that can help me, because I know I can't do it

10   myself.

11           And again, I just want to say I'm sorry

12   for -- to everybody that's involved, including the

13   victim and her mom, but all my friends and family

14   that have been dragged down, too, because of my

15   horrible choice.  That's all I've got.

16           THE COURT:  Thank you.  Mr. Donahoe.

17           MR. DONAHOE:  Thank you, Your Honor.

18   Judge, I'd like to begin by pointing out that Dr.

19   Scolatti isn't here today, and I said in the

20   memorandum that he would be.  He was just -- it was

21   unavoidable.  He couldn't be here.

22           THE COURT:  I've read his report.

23           MR. DONAHOE:  Right.  And I did contact

24   Counsel, I wanted the Court to know, about him not

25   being here.  I communicated directly with Ms. Hurd.

******

1   She said, in the Government's view, it was not

2   necessary for him to be here.  She was content with

3   the report.  So if the Court please, I would ask

4   the Court to just accept the report and its

5   content.  Of course, if the Court had any specific

6   questions, I would do what I could to work that out

7   or whatever.

8           THE COURT:  This is a difficult case.

9   The facts here are not good.  The crime was an

10  egregious crime.  In summary, the Defendant last

11  year, March through June, met, befriended, and

12  enticed this 13-year-old girl to engage in sexual

13  activities.  I think there were at least five

14  occasions.  Those sexual encounters included both

15  oral and vaginal sex with the child at different

16  times.  The Defendant knowingly lured this

17  13-year-old girl to pose for photographs displaying

18  her engaging in sexual conduct and utilized his web

19  camera and his laptop computer to maintain the

20  photos.

21          Now, I was impressed with the

22  thoroughness of Dr. Scolatti's --

23          MR. DONAHOE:  Uh-huh.

24          THE COURT:  -- handling of the matter,

25  and I noticed that he was very optimistic in his

1    conclusion about the ability of the Defendant to

2    recover and straighten up and fly right.  And, of

3    course, that has to be taken into account, and will

4    be.  And I think it is unfortunate we don't have

5    his testimony here today, but I'm satisfied to go

6    forward with the report.  And apparently the

7    Government is, too.

8         MS. STEWART:  That is correct, Your

9    Honor.

10        THE COURT:  Very well.  You can address

11   the report in some detail if you care to emphasize

12   any part of it.  I don't have any questions of you

13   about the report.

14        MR. DONAHOE:  Okay.  Well, Your Honor, if

15   I could continue.  Thank you.  I appreciate that,

16   Your Honor, and will take it into account, although

17   Dr. Scolatti is not here.  And again, I apologize

18   for that, but I thought it better to go forward and

19   stay on task given its comprehensive nature and its

20   thoroughness, to which the Court has already

21   alluded.

22        I, too, was impressed with the report and

23   read it carefully and recognized that there's a

24   delicate balance contained in those papers between

25   who this individual is, what he has done, and what

1    the future may hold for him.  And I recognize that

2    there are judgment calls that have to be made here

3    and that the Court is concerned about the sensitive

4    nature of those decisions.

5           My impressions of this individual are

6    that he stands apart from most, Your Honor.  I've

7    spent extensive time with Dan leading up to the

8    decision to plead guilty, in preparation for

9    sentencing, during the progress and the preparation

10   of the Presentence Report, and I've come to know

11   him and I know his background.  I've spent time

12   with his mother.  I know his family history as

13   recounted by Dr. Scolatti.  And these events and

14   circumstances, especially pertinent to his father,

15   are extraordinary.

16           I have spoken directly to Dan's sister,

17   Tina, on more than one occasion, who is present,

18   and she tells me and confides to me how it was oh

19   so difficult for her not to blame Dan for her

20   father's death.  Something that Ms. Frantz left out

21   was that the weather was a little inclement that

22   day, and there was apparently some advice, at least

23   Tina understood this, that they shouldn't go on the

24   boating trip for that reason.  But Dan wanted to

25   go.  He and his father both enjoyed that activity.

1    And he just pressed. And in the end, after all was

2    said and done, Tina took that as, boy, I just knew

3    they should have never gone.

4         And all of this went unsaid. And there

5    was no real grieving process. And I know it's

6    pretty fashionable today to say that we have all

7    manner of help for different situations that people

8    encounter, and I was born in the '50s and we didn't

9    have that kind of help. And we just were told when

10   we encountered difficulty to kind of buck up and

11   move on.

12        Sometimes we look with a little

13   skepticism at what help there is today. Maybe do

14   we overdo it? I think what I want to impress upon

15   the Court is that Dan really didn't have anything.

16   He had a difficult situation at home with his mom

17   and his stepdad. His father becomes deceased.

18   He's a ten-year-old boy, and I can see that in my

19   mind's eye with a man telling me, "Don't call me

20   dad. I'm not your father." Yet, he has no father.

21   His real father is deceased. This is a recipe for

22   a lost soul. And his life speaks to that.

23        He could be a poster child, this

24   individual, for difficulties that one could

25   encounter due to tragic circumstances. And, yes,

1   he does move on in life.  He's drug addicted.  He

2   has alcohol consumption problems.  Now he comes

3   into this situation where he's had sex with this

4   youngster.  But he now recognizes -- and I think

5   that's where Dr. Scolatti's report gives us hope.

6   He sees -- he's starting to see and pull back the

7   curtains and look at it for what it is.

8           And not only is he doing that as an

9   individual, Dan, but his family is helping him do

10  that.  His sister claims the fact that she blamed

11  her brother.  His mother claims the fact that she

12  may have been remiss in not getting him help.  She

13  relied on the school authorities or the people at

14  school.  And they are willing to come together and

15  stand with him, even down to Dan's former spouse,

16  who displays confidence in him and says that, yes,

17  she wants Dan to continue and maintain that

18  relationship with their children.

19          So this is not a case, Your Honor, where

20  the individual is just -- not somebody that is

21  lost, but somebody that is just entirely wrong and

22  in some ways looks like just one big mistake.  Dan

23  has made an egregious, egregious mistake here, and

24  he recognizes that, Your Honor.

25              He accepted responsibility for what went

1    on in the State court and for the hands-on nature

2    of his offense.  He stood here and pled guilty to

3    Your Honor to the two charges that were brought

4    against him, and he now recognizes that he has a

5    life to live, but he hopes and prays that the Court

6    can grant him some leniency, taper the

7    incarceration term based on the mitigation of his

8    past life and his lack of recognition of what he

9    was doing and where he was going and lengthen the

10   supervisory term post incarceration.

11        I have every confidence, as this man's

12   counsel, that he can adapt in his incarceration,

13   during his incarceration, he can program properly.

14   He's ready to learn.  He's open and he's

15   vulnerable.  And respectfully, Your Honor, I think

16   we as a society should take advantage of this

17   opportunity and not throw the baby out with the

18   bath water.

19        These little girls that he's raising and

20   has the relationship with could continue to love

21   and respect their father, and he could work hard

22   and they can give him incentive to want to work

23   hard to have a life so that he can love them and

24   watch them grow up and have relationships with them

25   when they are adults.  We've spoken about those

******

1    things.  And he weeps as he stands beside me.

2           I just ask, Your Honor, please --

3    thinking about the fact that really what drives the

4    advisory sentence here is that five-point

5    enhancement for the pattern.  In all technical

6    respects, it applies.  But given the fact that he

7    stood up as a man and took responsibility in the

8    State court, that enhancement should not have the

9    same impact here in the wider context of everything

10    that has gone on.  And I ask you please to come

11    back down.  If we do, from the advisory range where

12    we are now, 210 to 262, we get closer to the

13    minimum term, to the 121 months.  And I ask Your

14    Honor to please consider seriously sentencing Dan

15    to a term within that range, within that lower

16    range.

17           He's a person that's motivated.  He has a

18    good heart.  He wants to take this tragic life that

19    is his own and that he is the author of and admits

20    that and amend his ways and be a better person.

21    And I just have every confidence he can do it, and

22    I ask Your Honor, please give him that chance.

23    Thank you.

24           THE COURT:  When the Defendant is clean

25    and sober, he does appear to be intelligent and a

******

1    productive member of the community, but he does

2    acknowledge that over the years the substance abuse

3    has cost him dearly.

4            THE DEFENDANT:  (Nods head.)

5            THE COURT:  Admits this with respect to

6    the military, his family, employment, his freedom.

7    It's true he has taken responsibility for his

8    actions.  He does acknowledge that he needs

9    additional substance abuse and mental health

10   treatment, and the Court hopefully can provide

11   that.

12           Now, let's hear from United States.  Ms.

13   Stewart.

14           MS. STEWART:  Yes, Your Honor.  It's the

15   Government's position that the 3553A factors

16   warrant a sentence within the advisory guideline

17   range, followed by lifetime supervised release.

18   This is a very serious offense, Your Honor, and I

19   want to look at the nature of the circumstances of

20   this offense that we are at.  The Defendant was 36

21   years old, an adult male who pressed and seduced a

22   13-year-old into having five sexual contacts with

23   the Defendant for approximately a three-month span

24   in 2007.

25           The victim's letters address some of the

1       contacts; and from reading the 13-year-old victim's

2       letter, you can see -- you can feel the pain and

3       the hate that she's still reeling from these events

4       that were well over a year ago.  And Count II deals

5       with the Defendant photographing his own genitals

6       and shipping them over the Internet to this

7       13-year-old as part of this course of conduct he

8       has with her over these three months and the

9       sexually-explicit conversations and contact with

10      her.

11              It's not a one-time event.  This is a

12      serious crime.  The Defendant's criminal history

13      starts at age 20.  And as Your Honor pointed out

14      just a minute ago, there is significant substance

15      abuse, whether it's alcohol or marijuana, scattered

16      throughout his history.  A sentence within the

17      Guideline range would deter the Defendant from

18      further criminal conduct.  It would provide just

19      punishment in this case.  It will hopefully protect

20      the public from further crimes by this Defendant,

21      and also then provide the treatment, both substance

22      abuse and sex offense -- sex offender wise, that

23      the Defendant needs.  Thank you.

24              THE COURT:  Thank you.

25              Mr. Dietz, are you ready, then, for the

1    Court to impose sentence?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And Mr. Donahoe, is there any

4    reason, legal or otherwise, why sentence ought not

5    be imposed?

6              MR. DONAHOE:  No, Your Honor.

7              THE COURT:  The Guideline range here is

8    210 to 262 months.  The Defendant is entitled to a

9    14-month credit from the sentence in the Guideline

10   range, and this is for the use of relevant conduct

11   insofar as the State's sentence is concerned.

12             Beginning, then, at the bottom of the

13   Guidelines, it is the judgment of the Court, Mr.

14   Dietz, that you be remanded to the custody of the

15   Attorney General and the Bureau of Prisons for

16   incarceration for a term of 196 months as to Count

17   I and 120 months as to Count II, those terms to run

18   concurrently, each with the other, and likewise,

19   those counts to run concurrent to the sentence

20   imposed by the Lewis and Clark County Court here in

21   Montana in Case No. ADC-2007-280.

22             Now, I'm going to recommend that the

23   Bureau of Prisons designate you for resident sex

24   offender treatment at a facility where that is

25   available.  I'm going to recommend, also, that you

1    participate in the 500-hour residential drug

2    treatment program.  Upon release from imprisonment,

3    you'll be placed on supervised release for a term

4    of ten years on each count, to run concurrently.

5         Now, while on supervised release, you are

6    prohibited from committing a federal, state, or

7    local crime; prohibited from possessing a

8    controlled substance; prohibited from owning,

9    using, or being in possession or constructive

10    possession of a firearm or destructive device,

11    including black powder firearms.

12         You are required to cooperate in the

13    collection of DNA as directed by the United States

14    Probation Office.  You must comply with the

15    standard conditions of supervised release which

16    have been promulgated by the United States

17    Sentencing Commission.  Now, this Court has

18    approved and adopted those particular conditions,

19    and they are hereby made applicable to you in their

20    entirety.

21         And there are these special conditions:

22    First of all, it's necessary that the probation

23    office be vigilant; and if it determines that you

24    need to participate in substance abuse testing,

25    that you be required to participate in that program

1       to include not more than 104 urinalysis tests, not

2       more than 104 breathalyzer tests annually during

3       the period of supervision.

4               In addition to that, the same is true as

5       to programs for mental health and substance abuse

6       treatment.  It is required that you enter and

7       complete a sex offender treatment program; all of

8       these as directed by and until released therefrom

9       by the United States Probation Office.  You must

10      abide by the policies of each of the programs for

11      which you are entered.  And it may be that you will

12      be required to pay all or part of the costs of that

13      treatment.

14              It is a condition of your supervised

15      release that you comply with sexual offender

16      registration requirements for convicted offenders

17      in any state in which you reside.  You are

18      prohibited from residing in a home or residence or

19      being in the company of a child under the age of 18

20      without the consent of the United States Probation

21      Office.  You're prohibited from having contact with

22      the victims in this case without permission of the

23      United States Probation Office and the Court.

24              You're prohibited from going to or

25      loitering near any school grounds, yards, parks,

1     playgrounds, arcades, or other places primarily

2     used by children under the age of 18.  You're

3     prohibited from dating or socializing with one who

4     has children residing under the age of 18 without

5     the permission of the probation office.  You are

6     prohibited from possessing any materials depicting

7     sexually-explicit conduct as defined in federal

8     law, including visual, auditory, telephonic, or

9     electric -- electronic media and computer programs

10    and services.  You shall not patronize a place

11    where such material or entertainment is available.

12          You're prohibited from utilizing 900 or

13    adult telephone numbers or any other sex-related

14    numbers.  You're prohibited from possessing a

15    camera phone or electronic devices that could be

16    utilized for covert photography.

17          You're required to register as a person

18    -- as a sex offender with local, tribal, county law

19    enforcement in the jurisdiction in which you reside

20    or where you are employed or where you are student,

21    and you must do so within three days of your

22    arrival within that jurisdiction.  In addition,

23    after any change of status, change of name or

24    residence, you must register and report such

25    changes.

1          Now, under the Adam Walsh registration

2    requirements you must submit your person and any

3    property, house, residence, vehicle, papers,

4    computer, other electronic communication data,

5    storage devices, or media and effects, all of which

6    are subject to search at any time, with or without

7    a warrant, by any law enforcement or probation

8    officer with reasonable suspicion concerning a

9    violation of conditions or unlawful conduct.

10         You are prohibited from possessing or

11    ingesting alcohol and prohibited from entering

12    within establishments where alcoholic products are

13    sold for consumption on the premises.  In other

14    words, stay out of the bars, because that's a

15    source of trouble for you.

16              THE DEFENDANT:  (Indicating.)

17              THE COURT:  Under the Violent Crime

18    Control Act of 1994 you're required to notify the

19    United States Probation Office at least ten days

20    prior to any change of address.  You're prohibited

21    from possessing police radio scanning devices or

22    computer hardware or software that would enable you

23    to monitor law enforcement activity.

24         We are not quite finished yet.

25              THE DEFENDANT:  (Indicating.)

1            THE COURT:  You are prohibited from

2       possessing or using a computer or other device with

3       access to any online computer service without prior

4       approval of the probation office.  This includes

5       any Internet service provider, bulletin board

6       system, or any other public or private computer

7       network.  You are prohibited from having access to

8       a modem during that term of supervision, except

9       with the prior approval of the United States

10      Probation Office.  And, of course, you must allow

11      the probation officer to make periodic unannounced

12      examinations of any computer.

13            You're required to maintain a current,

14      complete inventory of computer access, including,

15      but not limited to, bills pertaining thereto,

16      telephone bills insofar as modem access is

17      concerned, and are prohibited from possessing

18      encryption or scanography software.  You must

19      consent to third-party disclosure in an employment

20      situation unless excused by the probation officer.

21            Now, you are required additionally to

22      provide a complete record of all passwords,

23      Internet service providers, and user

24      identifications to the probation office; required

25      to submit any monthly Internet service bills and

1    shall join in any consent form to allow access to

2    those by the probation office.  You are prohibited

3    from having installed any programs designed to

4    encrypt data files, folders, or volumes on any

5    media, and must, upon request, provide the

6    probation office with passwords to such equipment.

7           The probation office shall have the right

8    to install, at any reasonable time, on your

9    computer or one used by you, other than one owned

10   by an employer, filtering software designed to

11   prevent you from having access to prohibited

12   websites.  And the same is true of any hardware or

13   software systems deemed by the United States

14   Probation Office as necessary to monitor your

15   computer use.

16          Now, as we indicated earlier at the

17   outset, the Court finds that restitution in the

18   amount of 3,524.01 is required to be entered in

19   this case, and the Court so orders that this amount

20   is required to be paid by you and paid -- if you're

21   unable to pay it forthwith, that it be paid at a

22   minimum rate of 10 percent of your monthly income

23   or otherwise by the probation office.  And that

24   money shall be paid to the Clerk of the United

25   States District Court and by that Clerk disbursed

1      to the name and address set forth in the papers

2      here, which is Donna Davidson.

3              Now, the fine here in this case,

4      including the cost of detention and supervision,

5      exceeds $400,000.  The Court finds you do not have

6      the monetary ability to pay a fine, and I'm going

7      to waive the monetary fine in your case.  I think

8      that community service would be beneficial for you

9      and also for the public, and the Court orders 250

10     hours of community service.  The Court does order

11     payment of the special assessment, which is $100

12     per count.  And that is the sentence.

13             Now, I want to tell you the reasons for

14     the sentence in just a moment here, Mr. Dietz, but

15     at this point do you have any question about the

16     sentence?

17             THE DEFENDANT:  I think it's pretty

18     extreme compared to the people that I've seen

19     convicted and sentenced to five years for molesting

20     and raping young boys and killing them and getting

21     five years for it.  I think it's pretty extreme.

22     In 18 years I'll be 60 years old.  None of those

23     things that you just read off are going to apply to

24     me at 60 years old.  My kids are going to be 30

25     years old.  They are not going to be kids anymore.

******

*For The Record Reporting Services*
*Julie Sampson - (406) 498-3941*

1    That's all.  Get that off my chest.  It's going to

2    be hard for me.

3         I feel like that sentence is -- that

4    sentence makes me want to do the kind of things I

5    used to do.  I'm not going to do them because I'm

6    committed to my recovery, but it makes me want to

7    do the kinds of things I used to do and lash out to

8    authority, because -- you know, I respect you and

9    prayed that God's will would be done in here, and I

10   believe that -- I believe that the sentence you

11   gave out, I guess that's what I get.  And I'm going

12   to do whatever I got to do day by day to continue

13   my recovery.  But I want to say that it sure

14   doesn't encourage me to continue my recovery.

15   Makes me want to die, honestly -- quite honestly.

16        THE COURT:  I might say that surely you

17   knew you were looking at a sentence with a

18   guideline range of 210 to 262 months.

19        THE DEFENDANT:  That's the probation

20   officer's guideline, but the guideline we found was

21   the minimum of ten years, 121 to 151.  That's what

22   I've been hoping for and what I thought for a long

23   time was going to be the guideline range.  I knew

24   that -- when I got the Presentence Report that

25   there was a possibility now that it was going to be

1    larger.  Facing it now at this moment is a lot

2    harder than knowing it might happen.  So, yes, I

3    did.

4              THE COURT:  All right.  Well, what I said

5    to you was not do you have any objection to the

6    sentence.  I asked you if you had any question

7    about it.

8              THE DEFENDANT:  No, I don't.

9              THE COURT:  I assume your question was if

10   you had an objection would I change it, and the

11   answer to that is no.  You have been sentenced.

12             THE DEFENDANT:  (Nods head.)

13             THE COURT:  And sentenced, in my

14   judgment, correctly or I wouldn't have imposed it,

15   sentenced according to the law or I wouldn't have

16   imposed it.  And let me tell you the reasons for

17   the sentence here.

18             Of course, we begin with the nature and

19   circumstances of the offenses.  We've discussed

20   that in some detail.  I don't think we need to go

21   through it again.  You victimized this 13-year-old

22   girl, violated her, had sex with her, and so forth;

23   photographed your own genitals, photographed her

24   doing a sexual act.

25             You are a 37-year-old Caucasian.  You're

1    the father of two, primarily raised in

2    Pennsylvania.  You have a biological sister and two

3    half sisters.  Your parents were divorced at an

4    early age.  Your mother remarried to Mr. Frantz,

5    and over the years you've had quite a turbulent

6    relationship with him.  You suffered great trauma

7    when you lost your father on a rafting trip.

8           Unfortunately, that had an impact on you

9    with bad results, according to you, at least,

10   because your father was lost.  You, through life,

11   apparently have walked your own way.  You did have

12   trouble with school.  And this obviously was a

13   traumatic problem for you, but certainly it isn't a

14   license to do the things that you have been charged

15   with in this crime.

16           THE DEFENDANT:  (Nods head.)

17           THE COURT:  I think I mentioned earlier

18   that you're very intelligent, in my view.  You can

19   be productive if you obey the law and stay clean

20   and sober.  The Court considered the need for the

21   sentence imposed to reflect the seriousness of the

22   crime, to promote respect for the law, and to

23   provide just punishment for the offense.

24           Now, the Court doesn't just hand out this

25   sentence out of thin air.  There's been a great

1    deal of study and work that has gone into this,

2    beginning with the United States Congress enacting

3    the laws, going to the United States Sentencing

4    Commission which has established that -- certain

5    guidelines and standards, a probation office

6    structure that investigates every detail possible

7    connected with the sentencing.  And here you've had

8    the benefit of a psychological examination.  Every

9    fact that is known has been brought out here.

10           And also to afford adequate deterrence to

11   criminal conduct.  You do have some prior criminal

12   conduct, but you haven't really spent any

13   significant amount of time in custody until now.

14   And so, this particular sentence will be a

15   deterrent from further criminal conduct, and, of

16   course, it's hoped that other individuals involved

17   in similar conduct may be deterred, as well.

18           There's an element here of protection to

19   the public from further crimes.  The detention

20   sentence, of course, should protect the public

21   during that period.  In addition, supervision for

22   ten years here will provide more protection, and

23   under the State sentence there will be additional

24   supervision that will go on beyond that.  In fact,

25   the Court reduced the supervision period of the

******

1      United States Probation Office to ten years from

2      lifetime supervision.

3                  Now, I'm going to try to get you into the

4      500-hour drug treatment program, also any mental

5      health treatment during your incarceration term.

6      But I just want to tell you -- you're intelligent

7      enough to know -- that any change comes from

8      within.  It's up to you to get into these programs,

9      to pay attention to them, and to profit from them

10     yourself.

11                 The Court has considered any policy

12     statements issued by the Sentencing Commission.

13     The Court has considered the need to avoid

14     unwarranted sentence disparities, has considered

15     the restitution requirement, and, in short, has

16     followed what I think is the law here in imposing

17     sentence.

18                 Now, to the extent that you have a right

19     to appeal the sentence -- and feeling the way you

20     do, maybe you should appeal it, but what you have

21     to do in order to maintain that appeal is file a

22     written notice of appeal, and you must do so within

23     ten days of entry of the Court's written judgment.

24     That's the one thing you have to do soon to

25     preserve your appeal rights.  And you can visit

1       further with Mr. Donahoe about it if you're

2       considering an appeal.  That's your statutory

3       warning.

4               Anything further from the Government?

5               MS. STEWART:  No, Your Honor.

6               THE COURT:  Anything further from the

7       defense?

8               MR. DONAHOE:  No, Your Honor.

9               THE COURT:  The Defendant is remanded to

10      the custody of the marshal.  Court's adjourned.

11              THE BAILIFF:  All rise.

12

13              **(Proceedings concluded at 12:20 p.m.)**

14

15

16

17

18

19

20

21

22

23

24

25

**\*\*\*\*\*\***

*For The Record Reporting Services*
*Julie Sampson - (406) 498-3941*

1                           <u>**CERTIFICATE**</u>

2

3   STATE OF MONTANA              }
                                  }  ss:
4   COUNTY OF  BUTTE—SILVER BOW   }

5

6                    I, Julie L. Sampson, Professional

7        Court Reporter, a notary public in and for the

8        aforesaid county and state, do hereby certify that:

9                    I am a duly-appointed, qualified

10       Court Reporter; that I reported all of the

11       foregoing proceedings had in the above-entitled

12       action, and the foregoing transcript contains a

13       full, true, and correct transcript of the said

14       proceedings to the best of my ability.

15                   IN WITNESS WHEREOF, I have hereunto set

16       my hand this 10th day of November, 2008.

17

18
                         _____/s/_____Julie Sampson_____
19                       Julie L. Sampson
                         Court Reporter
20

21

22                       _____/s/_____Julie Sampson_____
         **(SEAL)**      Julie L. Sampson
23                       Notary Public for the State of Montana
                         Residing at Butte, Montana
24                       My Commission Expires July 10, 2010

25

                              ******